IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. TDC-20-046 |
| | * | |
| PAGE BOYD, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | ******* | |

## RESPONSE TO MOTION FOR DETENTION HEARING

On March 24, 2020, the defendant filed a motion for a detention hearing. A hearing has been scheduled for 2 p.m. on March 30, 2020, before U.S. Magistrate Judge Deborah L. Boardman. The government files this response to provide the Court with information critical to weighing the factors for detention outlined in the Bail Reform Act.

In his motion, the defendant does not invoke those factors at all, instead making clear that the only reason he is seeking a review of his detention status at this time is that the COVID-19 pandemic. Though the defendant is entitled to a detention hearing, this Court and the United States District Court for the District of Columbia have recently and repeatedly denied similar claims made by other detainees (such as this defendant) housed in facilities run by the D.C. Department of Corrections ("DOC") where the Bail Reform Act dictated detention. *See United States v. Martin*, 2020 WL 1274857, PWG-19-140 (D. Md. Mar. 17, 2020), ECF No. 209 (Order by Judge Grimm); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake); *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Order by Magistrate Judge Sullivan); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms); *United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day); *United States v. Hill*, APM-19-260 (D.D.C.), Minute Order dated March

19, 2020. Because the individualized determination required by the Bail Reform Act indicates that the defendant poses a danger to the community and a potential flight risk, this Court should enter an order for his detention.

## Background

On February 5, 2020, a federal grand jury for the District of Maryland returned an indictment charging the defendant with one count of racketeering ("RICO") conspiracy in violation of 18 U.S.C. § 1962(d) and one count of conspiracy to distribute and possess with the intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841 & 846. The charges stemmed from a conspiracy to bribe Maryland correctional officers to smuggle drugs and other contraband into a Maryland maximum state prison, the Jessup Correctional Institution ("JCI").

On February 10, 2020, the defendant was arrested pursuant to the indictment. At the time of his arrest, the defendant was en route to meet with his Maryland probation officer as he had just been released from JCI in October 2019 and was still on supervision. Despite this, a search of a backpack found in the vehicle at the time of his arrest revealed the presence of numerous controlled substances including about 13 containers and two baggies containing suspected cocaine, 10 green or pink containers with suspected heroin, and about 22 packs of Suboxone strips of both 8 and 12 milligram varieties.[1]

---

1 Besides the defendant, there were two other people in the vehicle just before the search - Ms. Norfleet and a 19 year-old male who was apparently the defendant's nephew. Ms. Norfleet did not give a statement, but the defendant's nephew told law enforcement that the backpack belonged to the defendant and that the defendant had taken the Suboxone from him.

Following are pictures of some of the items found:




On March 24, 2020, the defendant filed the instant motion for a detention hearing. ECF No. 129. The defendant appears to argue that the COVID-19 pandemic justifies his release. As detailed below, all of the factors outlined in the Bail Reform Act weigh in favor of the defendant's continued detention, and the defendant's speculation about COVID-19 does not overcome that calculus.

### Argument

**I.   Legal Standard**

The defendant's motion, which focuses exclusively on the COVID-19 outbreak, ignores the factors a court must consider in determining whether a defendant poses a danger to the community and whether his presence in court can be assured. These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Because of the nature of the charges against the defendant, the

Government also is entitled to a presumption that no combination of release conditions will assure the safety of the community and the defendant's presence in court. *See* 18 U.S.C. § 3142(e)(3)(A).

**II.      All of the § 3142 Factors Weigh Heavily in Favor of Detention.**

In this case, an examination of the § 3142 factors demonstrates that the detention order should remain in place.

**A.      The Nature and Circumstances of the Offense**

As Judge Coulson determined at a February 12, 2020, detention hearing involving one of the defendant's co-conspirators, the nature and circumstances of the offenses charged here are incredibly serious. The indictment charges the defendant and 14 others with engaging in a conspiracy to smuggle controlled dangerous substances such as heroin and Suboxone, along with other contraband, into JCI, one of Maryland's maximum security correctional facilities. ECF No. 1. The indictment outlines how the defendant routinely discussed his smuggling operation with his girlfriend and co-defendant Laurice Norfleet. For example, during recorded jails call on March 1, 2019, the defendant and Norfleet confirmed that Norfleet had obtained Suboxone strips, a Schedule III controlled substance, that she provided to their co-conspirator Chaz Chriscoe for smuggling into the facility for the defendant. *Id.* at ¶ 25.39-40. The defendant informed Norfleet that he could sell the Suboxone strips for $50 each inside JCI (strips sell for roughly $3 outside the facility). *Id.* A few days later, Norfleet was intercepted on a wiretap telling Chriscoe that she had given him over 300 strips--127 for the defendant[2] and another 100 of which were for their co-defendant Smith. Apparently, the defendant's supply of Suboxone went quickly, because by April 8, 2019, the defendant and Norfleet were recorded discussing a new shipment of Suboxone strips

---

2 At $50 each, this amount of strips would be valued at $6,350 in JCI.

that Norfleet had provided for smuggling. *Id.* at ¶ 25.57. This pattern repeated itself again only a few weeks later. *See id.* at ¶ 25.64.[3]

At a February 12, 2019, detention hearing for Chaz Chriscoe, Magistrate Judge Coulson found that these charges struck at the very heart of the criminal justice system, and specifically, at the State of Maryland's ability to mete out justice and punishment in an effective and orderly manner. As Judge Coulson recently wrote when denying Chriscoe's motion to review his detention in light of COVID-19, the "nature of the offense [indicated] that [the] Defendant had been able to circumvent … the controls against contraband at JCI without detection." ECF No. 131. Judge Coulson concluded that this behavior undermined any possible confidence the Court could have in Chriscoe's capacity to abide by any conditions of release that the Court might be set. The same holds true here.

### B. Weight of the Evidence

The government's case against the defendant is also particularly strong. As reflected by many of the allegations in the indictment, the government's case against the defendant includes about six months of wiretap interception of seven cell phones used in furtherance of the conspiracy as well as dozens if not hundreds of recorded jail calls. As already discussed, many of those calls involve the defendant openly and brazenly discussing his smuggling operation with his girlfriend and co-defendant Laurice Norfleet. Corroborating those jail calls, law enforcement intercepted calls and/or texts between Norfleet and Chriscoe coordinating times to exchange contraband for smuggling into JCI. A pole camera installed outside of a drug shop operated by Chriscoe further

---

3 If there were any doubt about the extent of the defendant's smuggling operation, those doubts were put to rest in October 2019, when the defendant was released from state custody. Upon the defendant's release, law enforcement conducted a search of the defendant's cell and found a large number of K-2 squares.

corroborates that Norfleet regularly met to provide contraband to Chriscoe to smuggle into JCI on Boyd's behalf.  If there were any doubt who Norfleet was working with, calls or texts intercepted between Chriscoe and JCI inmate Darnell Smith (using a contraband phone) confirm that Norfleet was providing contraband for Boyd--whom Smith and Chriscoe routinely referred to by his real name.

### C. History and Characteristics of the Person

The defendant's extensive criminal history and his consistent inability to abide by conditions of release (or, for that matter, conditions of imprisonment) further merit his continued detention.  He has numerous drug convictions and a 2011 first degree assault conviction.

But perhaps more troubling than the quantity of the defendant's convictions is the way he has conducted himself while on supervision.  According to the Probation Office's investigation o the defendant's criminal history, the defendant has failed to appear nearly every time he has been released on supervision pending the disposition of criminal charges.  Maryland state courts have routinely had to issue bench warrants to ensure the defendant's appearance.

Nor has the defendant fared better while on probation after being released.  In 2011, the defendant received a 12 year sentence for first degree assault, but the court suspended all but 9 months of that sentence.  Within two years, however, the defendant had violated his probation and was sentenced to an additional 7 years in jail.

This pattern of poor performance on supervision continued until the very day of his arrest in this very case.  As already discussed, the defendant was arrested just outside of a Maryland state probation office where the defendant had a scheduled check-in meeting.  Law enforcement resorted to arresting him at the probation office only after surveillance indicated that the defendant was not living at the address he had provided to his probation officer.  As noted above, a search of

the defendant's vehicle uncovered significant quantities of controlled substances and drug paraphernalia, indicating that he had already begun violated the law, and the conditions of his probation, in the few months since he had been released last October.

### D. The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release

Ultimately, in light of (1) the defendant's extensive criminal history, (2) his poor prior performance on supervision, (3) the nature of the charges, and (4) the strength of the evidence against the defendant, the government's believes that the defendant cannot overcome the Bail Reform Act's presumption that no conditions of release could be fashioned to protect the community and ensure his attendance in court.

### III.   D.C. Department of Corrections Has Established Comprehensive Procedures to Avoid a COVID-19 Outbreak.

The defendant's motion does not contest the Government's analysis, focusing instead on the potential health risks posed by COVID-19 and ignoring the other § 3142 factors the Court must consider in determining whether a defendant poses a danger to the community and a flight risk. To be sure, the Bail Reform Act instructs courts to consider the "physical and mental condition" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A). Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release. The defendant does not allege that he has COVID-19 or even that he has been exposed to any individuals with COVID-19. In this way, he is not seeking release based on his *actual* "physical and mental condition." Instead he relies solely on the *possibility* of becoming infected. As discussed below, however, DOC, which oversees the D.C. Jail and CTF, has implemented substantial precautionary measures to mitigate this risk.

### A. Comprehensive Precautionary Measures Have Been Instituted to Avoid Transmission of COVID-19.

DOC has undertaken comprehensive precautionary measures to protect detainees from exposure to COVID-19. As additional measures are implemented, DOC is alerting the public to the precautions. *See* https://doc.dc.gov/page/coronavirus-prevention. In addition to the information on the public webpage, the Government has learned the following by communicating with the United States Marshals Service ("USMS") and DOC's General Counsel.[4]

DOC has installed an "Incident Command System." Each day, the heads of DOC and relevant agencies meet to discuss COVID-19 issues as they pertain to the D.C. jails, to discuss strategies to combat any possible spread of COVID through the D.C. jails, to track national trends, and to make sure DOC's policies are consistent with those national trends and with recommendations from the Centers for Disease Control and the D.C. Department of Health.

DOC also has taken various steps to protect its facilities, to screen visitors and incoming detainees at intake, to maintain cleanliness within the facilities, and to increase its medical coverage within facilities, including:

- **No Non-Legal Visitation:** As of Saturday, March 14, 2020, DOC suspended all non-attorney in-person visits, programming, and volunteer activities, and has enhanced cleaning efforts, especially within common areas. For staff and legal visitors, DOC performs a COVID-19 screening for these limited visitors. The screening includes asking a series of questions to determine possible exposure to COVID, observing whether the person is displaying flu-like or COVID-associated symptoms, and taking their temperature. Anyone displaying symptoms, giving a positive response, or showing an elevated temperature, is denied entry into the facility.

- **Inmate Screening and Awareness:** All new detainees and inmates are subject to similar COVID-19 screening. If an inmate presents with symptoms or provides affirmative

---

[4] The Government is getting continual updates on the situation at D.C Jail and CTF. Any discrepancies between this filing and prior filings, whether in this or other cases in this District, reflect additional or revised information obtained in the interim. The Government recognizes that the situation is fluid and is trying to deliver the best information to the Court as we understand it at the time.

answers during screening, they are provided a face mask and taken to medical. Medical does an assessment and makes determination about whether transport to the hospital is appropriate. Furthermore, facility staff are going through the jail units and reminding detainees to put in requests for sick call to see medical if they are feeling poorly. Staff are reminded at roll calls about the need for various preventative measures.

- **Quarantine:** Particular units have been set up to operate as quarantine locations. Detainees are placed in quarantine locations if they show flu-like or COVID-like symptoms.

- **Extra Cleaning:** Additional measures have been taken to maintain cleanliness of facilities, detainee hygiene, and access to (and awareness of) medical treatment. DOC has increased its supply of cleaning and sanitation materials. They currently have 55,000 bars of soap and are issuing inmates one bar of soap each week, in addition to allowing additional purchases of soap through commissary. Posters are placed throughout the facilities to remind detainees about preventative measures they can take. DOC staff puts emphasis on maintaining clean surfaces, avoiding touching, and other similar precautions. In addition to standard cleaning, staff perform cleaning spot checks every two hours. A cleaning unit goes through areas common areas to clean frequently touched areas like elevator buttons, escalators, and railings.

The defendant's motion does not discuss these DOC precautionary measures or allege that these measures are insufficient to address the needs of detainees. Rather, the defendant's motion highlights various press articles and other limited information regarding (1) one DOC detainee who has tested positive for COVID-19 but is currently in quarantine; and (2) a Deputy U.S. Marshal ("DUSM") in D.C. Superior Court who has tested positive for COVID-19. This information does not merit the defendant's release. *See Williams*, PWG-13-544 (acknowledging that DOC has taken significant measures to stem the tide of the pandemic, and recognizing that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly.")

With respect to the DOC detainee who has tested positive, this detainee is a D.C. Superior Court defendant charged with first-degree murder while armed. Since on or about March 21, 2020, the detainee was housed in a single-occupancy cell. On March 25, 2020, medical staff determined

9

that the detainee had a fever and immediately tested the detainee for the virus; the test came back positive later that evening. The detainee is currently in insolation in DOC's infirmary. DOC's medical team is working closely with the D.C. Department of Health (DOH), in compliance with Centers for Disease Control guidelines. The housing unit where the resident was previously housed has been quarantined. The housing unit is also on restriction, limiting out of cell activity. When the residents leave their cells, they must wear surgical masks. DOC staff working in the unit must wear gloves and surgical masks. DOH is gathering the names of the staff and residents on the unit as part of its contact tracing investigation. As a result, 36 inmates officials think may have come in contact with the detainee have been quarantined. Four DOC detainees total have been tested for COVID-19—one of whom has tested positive, as discussed above, two of whom have tested negative, and one whose test results are pending.

With respect to the DUSM, as of March 19, 2020, DOC is taking immediate, responsible action to address any potential threat. For example, DOC has identified DOC inmates and detainees who appear to have been in the vicinity of the DUSM and is screening those inmates and detainees for illness. Pending screening, those inmates and detainees have been separated from the rest of the DOC population. Likewise, USMS has taken steps to mitigate any risk from DOC and USMS personnel in the vicinity of the DUSM. Specifically, USMS sent home 95 deputies who had at least moderate contact with the DUSM in order to permit those individuals to self-quarantine; deputies from other jurisdictions were brought in to handle court matters.

Each of these reasonable steps is intended to address the actual threat posed by the DUSM's COVID-19 diagnosis, and is far more relevant to the Court's determination than the hypothetical speculation that is the focus of the defendant's motion.

### B.     The Defendant's Individual Circumstances Do Not Merit Release.

The defendant's asthma condition does not change the analysis.  When faced with a similar motion for release based on COVID-19, of a defendant suffering from "diabetes, high blood pressure, asthma, and pain," Judge Grimm denied the motion for release without a hearing.  *See United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209.  Similarly, Magistrate Judge Sullivan denied a motion for release based on COVID-19 of a defendant suffering from diabetes, even though "experts on COVID-19 have stated that individuals with diabetes are at a higher risk of experiencing more serious complications if infected with the virus." *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Order by Magistrate Judge Sullivan).  And Magistrate Judge Simms similarly denied relief for a defendant who "suffered an aneurysm (in the past), had prostate cancer (now in remission), and presently suffers from diabetes, the latter two conditions having compromised his immune system and/or put him at a higher risk of an inability to fight infection . . . ." *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms).  Judge Blake also denied relief for an asthmatic defendant.  *See United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake).  And Magistrate Judge Day denied relief for a 67-year-old defendant.  *United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day).]

While the COVID-19 virus is new, health claims by detainees are not.  Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008).  These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside.  *See United States v. Rodriguez*, 50 F. Supp. 2d

717, 722 (N.D. Ohio 1999). In this case, the defendant simply has not made a factual record that his needs will not be met while detained. Granting a defendant's motion for release based on a general, speculative claim of harm flies in the face of the defendant-specific analysis required by 18 U.S.C. § 3142(f).

**IV.     Releasing the Defendant And Others Similarly Situated Would Place an Undue Burden on Pretrial Services and the Court, Thereby Increasing Community Danger.**

Awarding relief here, and in similar cases, would place a substantial and unwarranted burden on the Pretrial Services Division of the U.S. Probation Office, as well as the Court. Whenever the Court orders electronic monitoring, a Location Monitoring Specialist is appointed to oversee the defendant's pretrial release. To be sure, one case, by itself, would not strain the system. But if the Court released the defendant, then undoubtedly an avalanche of defendants would also seek release. Each defendant would make the generic argument, now being made by the defendant, that he should be released to reduce contact with other persons and have greater access to healthcare in the community—notwithstanding the fact that, twice now, the Court has detained the defendant to protect the community *from* him. The speculative prospect of a COVID-19 outbreak at D.C. Jail does not diminish the public interest in keeping the defendant off the streets based on a judicial finding of dangerousness that cannot be ameliorated by any combination of release conditions. And if the Court did release the defendant, and other defendants, such release would not only endanger the community, it would quickly stretch the bandwidth of existing LM specialists beyond its breaking point.[5]

---

[5] Before a defendant is placed on release, a Pretrial Services Officer also must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. A flood of release orders would force these Officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection.

**Conclusion**

For the foregoing reasons, the Court should enter an order continuing the defendant's detention pending trial.

                Respectfully submitted,

                Robert K. Hur
                United States Attorney

                /s/
                Burden H. Walker
                Lauren E. Perry
                Assistant United States Attorney